IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JEANNINE MURPHY,

                              Plaintiff,

              v.                                                    OPINION and ORDER

JUNEAU COUNTY, WISCONSIN,                                          22-cv-33-jdp
BRADLEY J. BIRES, and ADAM MORRIS,

                              Defendants.

---

One April evening in 2019, Juneau County sheriff's deputies knocked on the door of plaintiff Jeannine Murphy, looking for a missing teenage girl. The investigation quickly went off the rails. Murphy was generally cooperative but mouthy, and defendant Deputy Bradley Bires was rude and physically aggressive. Murphy ended up pinned to the ground and handcuffed, purportedly for disorderly conduct. Murphy was later released without charges, but Bires was reprimanded for unprofessional conduct.

Murphy filed this suit against the two arresting deputies, claiming that that her arrest violated the Fourth Amendment because it was not supported by probable cause and because the defendants used excessive force in effectuating it. Murphy names the county as a defendant only because it is obligated to indemnify individual defendants under Wis. Stat. § 895.46. Defendants move for summary judgment, contending that body camera video of the incident vindicates them, at least enough to entitle them to qualified immunity. Dkt. 15.

Defendants' motion will be denied. Defendants did not turn on their body cameras until the incident was under way, so the video does not show the whole incident. And the portion that was recorded does not plainly show that Murphy was disorderly or that the deputies used only the force necessary under the circumstances. Even with the video, material

facts are genuinely disputed, so the case will have to go to trial. Following the court's historical approach, it is appropriate and efficient to keep the county as a defendant in the case for the purpose of ordering complete relief to Murphy should she prevail on her claims against Bires and Morris.

UNDISPUTED FACTS

The following facts are undisputed, unless otherwise noted.

**A.  The parties and background information**

Plaintiff Jeanine Murphy resided in Necedah, Wisconsin with her daughter and stepson. Defendants Bradley Bires and Adam Morris were deputies in the Juneau County Sheriff's Office.

The evening of April 23, 2019, Murphy had given her permission to allow her daughter's friend, K.P.,[1] to stay the night. Murphy knew K.P. and her father, Glen P.

At approximately 9:00 p.m. that evening, dispatch notified Bires, Morris, and Deputy Molly Schaller that Glen P. had reported K.P. missing after she walked out of their house at approximately 8:00 p.m. and had not returned. At some point while the officers were searching for K.P., Glen P. advised them that the GPS information in her phone showed that she might be at Murphy's house. Bires, Morris, Schaller, Necedah Officer Mariah Vogel, and Glen P. all went to Murphy's residence to investigate.

At the time, sheriff's deputies had recently been issued body cameras that recorded audio and video. Juneau County Sheriff's Department policy requires deputies to activate their

---

[1] The court has substituted the minor's initials for her full name to protect her privacy.

cameras whenever they can safely do so at the beginning of any contact with the public. But neither defendant activated his body camera during the initial encounter with Murphy. Murphy did not activate his body camera until he went to cover the rear of Murphy's house, and Bires activated his body camera only after Murphy was on the ground in handcuffs.

The court has the body camera recordings, Dkt. 21, and transcripts of the recordings, Dkt. 25-5, -6. The evidence of what happened before the body cameras were turned on consists of the declarations and depositions of the witnesses.

### B.  Initial interaction at Murphy's door

Bires knocked on Murphy's door and announced that he was from the sheriff's office. When Murphy answered the door, Bires asked if K.P. was at the residence. Murphy responded that K.P. was sleeping on a futon in the dining room. At that point, one of Murphy's cats got out the front door. So Murphy told Bires that she would grab the cat and then get K.P. herself. Bires asked Murphy if he could go inside the house to get K.P., and Murphy refused. Murphy said that Glen P. could go inside to see his daughter, but Bires would not let K.P.'s father go inside. When Bires asked Murphy why she would not let him inside the house, Murphy responded that it was because he did not have a search warrant. Bires was frustrated with Murphy's refusal.

Murphy went down a small hill toward her garage, picked up her cat, and took the cat into her house. Murphy closed the door behind her. She then woke up K.P. and said, "You need to get outside. Your father is outside with several police officers." While Murphy was inside, Morris went to the rear of the house in case K.P. tried to escape out of a window or back entry.

**C.  Interaction between Murphy and officers outside of house**

Murphy remained in the house for a minute or so. When she opened the door, K.P. walked outside with Murphy directly behind her. Some of what happened next, before Morris arrived at the front of the house with his camera on, is disputed.[2] But the following facts are undisputed:

Murphy told K.P. something to the effect of, "Go over by your father," who was standing by the squad cars on the street. Bires wanted to interview K.P. before she interacted with her father. So he grabbed K.P. by the arm, yanked her back, and said that she was not going anywhere. Murphy told Bires not to pull on K.P. because K.P. just had foot surgery. Bires then extended his index finger and middle finger and jabbed Murphy in her chest, saying that she would not tell him how to do his job and that she was not the child's mother. Murphy told Bires not to put his hands on her.

At some point during the interaction, Morris heard yelling, so he came back to the front of the house. Loud voices can be heard on the footage from Morris's body camera as Morris runs up the side and around the corner of the house. Bires is talking loudly to Murphy, saying "You're not going to tell her" and apparently instructing K.P. to "get over here right now." Morris video at 1:11–1:14; Dkt. 25-6 (Morris transcript), at 2:4-5. Murphy again told K.P. she could go by her father, and Bires told Murphy to be quiet. Dkt. 25-6, at 2:6-8.

---

[2] Defendants say that in direct contravention to Deputy Schaller's instruction that K.P. stop on the sidewalk leading up to the front door, Murphy told to K.P. to go to her father and physically pushed K.P. past Bires. Murphy says that Schaller gave no such order and that she never would have pushed K.P. because she knew that K.P. had just had foot surgery. The parties dispute whether any of the law enforcement officers ever told Murphy to go back inside her house.

**D. Murphy's arrest**

The best view of Murphy's arrest is from Morris's body cam video, from 1:15 to 2:30. The corresponding transcript is Dkt. 25-6.

When Murphy protested that "it's her father," Bires took Murphy by the arm and began to turn her to the side, saying "You know what, I'm not fucking dealing with this right now." Murphy attempted to turn back toward Bires and began to say, "You're not taking me in." Bires ordered Murphy to "Turn around and put your hands behind your back," and bent Murphy's right arm behind her back. Morris assisted by grabbing Murphy's left arm. Murphy continued her protests, stating "All I said was she could go to her father" and "It's not your decision to arrest me." Dkt. 25-6, at 2:16-21. The parties agree that up to this point, Murphy had done nothing physical to impede them, did not express any hostility toward them, and did not try to injure them. Bires says that his decision to arrest Murphy was based solely on her verbal conduct, which he considered to be profane and loud. Morris did not see Murphy until Bires started to place her under arrest.

The video shows that Bires did not announce his intent to arrest Murphy before he put her right arm behind her back. The parties agree that as Bires and Morris attempted to put handcuffs on Murphy, she tensed and turned her head and upper body toward the officers. But the parties dispute whether Murphy complied with Bires's subsequent order to stop resisting and put her hands behind her back.[3] The video does not plainly show Murphy offering any physical resistance to being handcuffed.

---

[3] Murphy says that she stopped resisting when Bires told her to stop resisting. Defendants say that as they were attempting to handcuff Murphy, she was loudly argumentative and pulled her wrists away in an attempt to put her arms in front of her body instead of keeping them behind her back. Murphy denies this, stating that she was trying to turn and face Bires to talk

Nevertheless, Morris and Bires were apparently unable to place handcuffs on Murphy while she was standing. Part of the problem was that Murphy was wearing a baggy sweatshirt with the sleeves down over her wrists. But it is otherwise unclear from the video why the officers could not secure the handcuffs, because they were able to place Murphy's hands behind her back without apparent struggle. Nevertheless, just a few seconds after they had Murphy's hands under apparent control, Bires told the other officers to "just take her down."

Bires and Morris put Murphy on the ground face down. As they did so, Murphy said, "You're not taking me down. I have a fucked-up foot." To which Bires responded, "I don't care." Once Murphy was on the ground, Bires placed his left knee and shin across Murphy's left upper back and neck.[4] The officers placed Murphy in handcuffs while she was pinned to the ground. As Bires was in the process of handcuffing Murphy, one of Murphy's daughters approached, crying and stating, "No, it's my mommy." Bires said, "Well, maybe your mom needs to learn a little respect then."[5]

After Murphy was in handcuffs, Bires turned on his body camera. He addressed Murphy's verbal protests, instructed her to follow his directives, and ordered her to stand up

---

with him.

[4] Defendants say that Murphy continued to struggle against the officers' efforts to put her in handcuffs by not putting her hands behind her back, lifting her head and upper body away from the ground, and remaining argumentative with the officers. Murphy says the only movement she made was to look up as her daughter was approaching. The video does not resolve this dispute.

[5] Murphy's daughter says that Bires "jabbed his knee" into Murphy's neck area when he said this. Dkt. 23, at 12:7-9. Bires denies doing anything with his knee, and defendants contend that Bires only applied the minimal amount of pressure necessary to keep Murphy under control and her upper body stabilized. Morris's body cam video plainly shows Bires's knee and shin on Murphy's upper back and neck; whether this use of force was necessary is a dispute for the jury.

so she could be escorted to his police vehicle. He then assisted Murphy to her feet and escorted her across the street the police vehicle. Murphy remained argumentative throughout this process, but she offered no physical resistance.

### E. Post arrest

Murphy was released from custody the same night on a signature bond. No criminal charges were filed against her. Murphy filed a citizen complaint with the sheriff's department. The department reviewed the body camera footage and determined that Bires would receive a verbal warning and undergo professional communications training. Capt. Gary Pedersen issued the warning in a letter, stating "please understand that I am extremely frustrated with this. As a deputy sheriff it is of the utmost importance to remain professional at all times. Failing to do so is unacceptable." Dkt. 25-2.

### ANALYSIS

### A. Fourth Amendment Claims

Murphy asserts two claims under the Fourth Amendment: (1) her arrest was not supported by probable cause; and (2) the deputies' use of force against her was excessive. Defendants seek summary judgment on the grounds that they didn't violate the Fourth Amendment, and, even if they did, they are entitled to qualified immunity.

The doctrine of qualified immunity protects law enforcement officers who make reasonable errors of judgment in the performance of their duties, which often call for quick decisions made without the benefit of full information. Generally, a defendant is entitled to qualified immunity unless the plaintiff shows not only that the defendant violated her rights, but also that her rights were clearly established at the time. The plaintiff can meet this burden

by pointing to either: (1) a closely analogous, binding case that was decided in her favor; or (2) a more general constitutional rule that applies "with obvious clarity" to the defendant's conduct. *Cibulka v. City of Madison*, 992 F.3d 633, 639-40 (7th Cir. 2021). In deciding whether the defendants are entitled to qualified immunity on a motion for summary judgment, the court must view the evidence in the light most favorable to the plaintiff and ask whether a reasonable jury could find that defendants violated the plaintiff's clearly established rights. *Jerger v. Blaize*, 41 F.4th 910, 913 (7th Cir. 2022); *Kemp v. Liebel*, 877 F.3d 346, 350 (7th Cir. 2017).

### 1.  Probable cause for arrest

Murphy's first claim is that her arrest for disorderly conduct violated the Fourth Amendment because it was not supported by probable cause. An officer has probable cause to make an arrest when the facts and circumstances within the officer's knowledge would lead a prudent person to believe that the suspect has committed an offense. *Gibbs v. Lomas*, 755 F.3d 529, 537 (7th Cir. 2014); *Cibulka v. City of Madison*, 448 F. Supp. 3d 1002, 1020 (W.D. Wis. 2020), *aff'd*, 992 F.3d 633 (7th Cir. 2021). An officer assessing probable cause at the scene of a disturbance is not required to "determine whether a person's conduct satisfies all of the essential elements of a particular statute." *Stokes v. Bd. of Educ. of the City of Chicago*, 599 F.3d 617, 622-23 (7th Cir. 2010).

Defendants are entitled to qualified immunity on Murphy's false arrest claim if "a reasonable officer could have mistakenly believed that probable cause existed" to arrest Murphy for disorderly conduct. *Fleming v. Livingston County, Ill.*, 674 F.3d 874, 879-80 (7th Cir. 2012) (internal quotes omitted). This standard is often termed "arguable probable cause." *Id.* Arguable probable cause is established when "a reasonable police officer in the same

circumstances and with the same knowledge and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in light of well-established law." *Id*. at 880.

Wisconsin's disorderly conduct statute has two elements: (1) the individual engaged in violent, abusive, indecent, profane, boisterous, unreasonably loud, or similar disorderly conduct; and (2) the individual's conduct occurred under circumstances where such conduct tends to cause or provoke a disturbance. *Gibbs*, 755 F.3d at 538 (citing Wis. Stat. § 947.01(1)).

Murphy was not meekly compliant in her interactions with Bires. But Murphy argues that so long as she limited her cantankerous behavior to verbal protests, defendants could not have a reasonable basis to think there was probable cause to arrest her for disorderly conduct.

Wisconsin's disorderly conduct statute only "proscribes speech that is not constitutionally protected." *In re A.S.*, 2001 WI 48, ¶ 16, 243 Wis. 2d 173, 189, 626 N.W.2d 712, 718. And the First Amendment protects a significant amount of verbal criticism directed at police officers. *See City of Houston, Tex. v. Hill*, 482 U.S. 451, 461-62 (1987). In *Hill*, the Supreme Court approvingly cited Justice Powell's observation that "a properly trained officer may reasonably be expected to 'exercise a higher degree of restraint' than the average citizen, and thus be less likely to respond belligerently to 'fighting words.'" *Lewis v. City of New Orleans*, 415 U.S. 130, 135 (1974) (J. Powell, concurring) (citation omitted); *see also Payne v. Pauley*, 337 F.3d 767, 777 (7th Cir. 2003) ("[A]rguing with a police officer, even if done loudly, or with profane or offensive language, will not in and of itself constitute disorderly conduct.").

The undisputed facts here show that Murphy did not physically impede or resist the deputies at any point before Bires grabbed Murphy's arm to arrest her. And Murphy is correct that defendants would have no basis to arrest her for disorderly conduct based on her

complaints about the deputies' own conduct, which is a point clearly established by *Hill, Lewis, In re A.S.,* and *Payne.*

Defendants contend that they had probable cause to arrest Murphy for disorderly conduct because she interfered with the deputies' ongoing investigation of a missing minor and became increasingly argumentative and defiant toward the officers. They cite the following conduct in support of this contention:

(1) In direct contradiction to Schaller's and Bires's orders to K.P. to remain on the sidewalk, Murphy repeatedly told K.P. to go to her father and physically pushed K.P. past Bires.

(2) Murphy refused to obey the officers' orders to go back into her house.

(3) Murphy aggressively positioned herself very close to Bires, became argumentative, and yelled in Bires's face.

(4) When Bires again ordered Murphy to return to her residence and placed his hand on her arm to turn her towards the direction of the front door, she pulled away, turned to face him, and continued yelling loudly in his face.

(5) The volume of the yelling prompted Morris to run to the front of the house, where he observed Murphy loudly arguing with Bires.

None of this establishes a basis for qualified immunity at summary judgment.

Some of this conduct is genuinely disputed. The video evidence does not show Murphy pushing K.P., nor does it record any deputy ordering Murphy to return to her house. The testimonial evidence on these points is genuinely disputed. So, to the extent that defendants' qualified immunity depends on these facts, the matter will have to be decided at trial.

There is no dispute that Murphy was argumentative, but she was constitutionally entitled to complain about her treatment at the hands of the deputies, even loudly. And, the undisputed facts show that she had ample reason to complain. It was Bires, not Murphy, who repeatedly shouted obscenities. And it was Bires, not Murphy, who was physically aggressive—

he jabbed Murphy in the chest with his fingers. As far as Murphy being "aggressive," she was less aggressive and loud than Bires, who later admitted that he was "a little fired up right now." Dkt. 25-6, at 6. It would be "inherently unfair" for Biles to mistreat Murphy and then arrest Murphy for being disorderly because she complained about it. *See Payne*, 337 F.3d at 777 (7th Cir. 2003) ("It would be inherently unfair if an officer could rile up a crowd by mistreating a citizen in front of the crowd, and then could arrest that citizen for creating the disturbance.").

So that leaves defendants' assertion that Murphy interfered with their investigation of the missing child, K.P. The non-video evidence establishes that when Murphy and K.P. came out of the house, Murphy told K.P. that she could go to her father, who was standing outside. Defendants say that Murphy's instruction contradicted Deputy Schaller's order that K.P. remain near the deputies, but whether Deputy Schaller issued that order is disputed. Morris's body cam video records Murphy telling K.P she could go to her father a second time, triggering Bires to say "You know what, I'm not fucking dealing with this right now," and his immediate effort to restrain Murphy. There is no evidence that K.P. followed Murphy's instruction or otherwise disobeyed the deputies, or that any deputy made any effort to ensure that she did not. After all, there were four law enforcement officers and K.P.'s father at the scene to ensure the K.P. was safe, and that her hour-long absence from home could be thoroughly investigated. In response to the deputy's initial inquiry, Murphy immediately told the deputies that K.P. was in her home, and she promptly brought K.P. outside. Considering Murphy's version of the events, as the court must on summary judgment, a jury could conclude that Murphy's statements to K.P. were not abusive ones that would tend to cause or provoke a disturbance.

A jury could further conclude that no reasonable officer could have believed that Murphy had engaged in disorderly conduct. The bottom line is that factual disputes preclude

a determination at summary judgment of whether Murphy's actions created probable cause to arrest her for disorderly conduct and whether defendants are entitled to qualified immunity on this claim.

### 2. Force used by defendants

An officer's use of force during a seizure is unreasonable if, judging from the totality of the circumstances, the officer uses greater force than was reasonably necessary to effectuate the seizure. *Becker v. Elfreich*, 821 F.3d 920, 925 (7th Cir. 2016); *Gonzalez v. City of Elgin*, 578 F.3d 526, 539 (7th Cir. 2009). This determination is made from the perspective of a reasonable officer in light of the totality of the circumstances known to the officer, without regard to the officer's intent or his subjective beliefs. *Graham v. Connor*, 490 U.S. 386, 397 (1989); *Williams v. Indiana State Police Dep't*, 797 F.3d 468, 472-73 (7th Cir. 2015). In assessing reasonableness, relevant factors include the seriousness and immediacy of any threat posed by the plaintiff, the severity of any suspected crime, and the extent of the plaintiff's resistance or interference with an officer's duties. *Dawson v. Brown*, 803 F.3d 829, 833 (7th Cir. 2015).

Defendants contend that they used only minimal force to stabilize and handcuff Murphy, who disobeyed verbal commands and resisted arrest by yelling protests, attempting to free her arms from the deputies' grip by pulling away from them, refusing to put her hands behind her back, and struggling and resisting against the officers' efforts to secure her. Defendants further argue that they properly graduated their response and secured Murphy on the ground only after their verbal orders proved ineffective. *See U.S. v. Montoya de Hernandez*, 473 U.S. 531, 542 (1985) (quoting *U.S. v. Place*, 462 U.S. 696, 709 n. 10 (1983)) ("Authorities must be allowed 'to graduate their response to the demands of any particular situation.'");

*Turner v. City of Champaign*, 979 F.3d 563, 569 (7th Cir. 2020) (officers may use "significant force to subdue someone who is actively resisting lawful detention").

But Murphy denies putting up any resistance once Bires told her to stop resisting. She asserts that she gave the officers no reason to take her down or for Bires to place his knee on her neck area in a forcible manner. Murphy's purported crime was a minor one that posed no physical risk to anyone, and posed little risk of disturbance. Once Bires decided to arrest Murphy, there was essentially no non-physical effort to persuade Murphy to submit. The body camera recording is at best ambiguous; it does not clearly show Murphy's resistance to the deputies' efforts to effectuate the arrest.

A reasonable jury could conclude that the officers used excessive force. The right of a non-resisting subject to be free from unnecessary force is clearly established. *Miller v. Gonzalez*, 761 F.3d 822, 829 (7th Cir. 2014) ("[T]he law is clearly established that police officers cannot use 'significant' force on suspects who are only passively resisting arrest."); *Morfin v. City of E. Chicago*, 349 F.3d 989, 1005 (7th Cir. 2003) (jury could conclude grabbing non-resisting subject, twisting his arm, shoving him toward the wall, and taking him to the floor was excessive force). So factual disputes also prevent the court from deciding on summary judgment whether defendants are entitled to qualified immunity on the excessive force claim.

### B. Indemnification

Defendants argue that Murphy's claim against the county should be dismissed because Wis. Stat. § 895.46 does not provide a private cause of action for indemnification. *Jackson v. Graves*, No. 14-cv-1206, 2015 WL 5577527, at *4 (E.D. Wis. Sep. 22, 2015). *See also Williams v. Michalsen*, No. 19-cv-56, 2020 WL 1939136, at *9 (E.D. Wis. Apr. 21, 2020) ("If the individual officers are found liable, the indemnity mandated by § 895.46 will be triggered; the

plaintiffs do not need to sue the county for that to happen."). Murphy would not be able to bring a freestanding claim against the county. But should she prevail on her Fourth Amendment claims, Murphy will be entitled to a declaratory judgment that the county is obligated to indemnify Bires and Morris.

As this court has held in recent cases, it is appropriate and efficient to keep the county as a defendant in the case for the purpose of ordering complete relief to Murphy. *See Voegeli v. City of Janesville*, No. 20-cv-845, 2021 WL 4501837, at *4 (W.D. Wis. Oct. 1, 2021); *Holte v. City of Eau Claire*, No. 20-cv-131 (W.D. Wis. July 15, 2021); *Estate of Smith by Bryfczynski v. Oneida Cty.*, No. 19-cv-972, 2021 WL 2188220, at *12 (W.D. Wis. May 28, 2021). But the county's role in the case will not be disclosed to the jury, because that would be irrelevant and prejudicial. The county will be removed from the caption of any trial document that the jury sees, and the parties will not present any evidence or argument about the county's role as indemnitor.

ORDER

IT IS ORDERED that defendants' motion for summary judgment, Dkt. 15, is DENIED.

Entered April 21, 2023.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge